IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

EVA TONIN

v.                          :  Civil Action No. DKC 19-0323

BALTIMORE CITY POLICE DEPARTMENT
                            :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination action is the motion to dismiss filed by Defendant Baltimore City Police Department.  (ECF No. 11).  The issues have been fully briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, the motion to dismiss will be denied in part and granted in part.

**I.  Background**

Eva Tonin ("Plaintiff"), a female of Italian descent, is a current employee of the Baltimore City Police Department ("BCPD" or "Defendant").[1]  Defendant hired Plaintiff in August 2012.  After Plaintiff's successful completion of a probationary period, Defendant assigned her to the Southwest District ("SWD") in 2013.  Sergeant John Ferinde, an American male, was Plaintiff's supervisor.  Plaintiff alleges that Sergeant Ferinde "regularly

---

[1] Unless otherwise noted, the facts outlined here are set forth in the complaint and construed in the light most favorable to Plaintiff.

subjected her to discriminatory harassment based on her sex, national origin, and retaliation." (ECF No. 1, ¶ 10).

In March 2016, "Plaintiff was involved in a work related car accident and suffered injuries to her hip." (ECF No. 1, ¶ 11). The hip impairment limited Plaintiff's ability to bend, stand, and walk. The complaint is not entirely clear when, but at some point after the car accident and before November 2016, Plaintiff complained about Sergeant Ferinde's actions and self-reported anxiety, depression, and stress resulting from those actions.

In 2016, Plaintiff faced several disciplinary actions. (ECF No. 1, ¶¶ 16-19). On September 28, 2016, Defendant issued Plaintiff two Notifications of Internal Investigation: (1) CIU 16-01518 regarding alleged incidents on June 24, 2016 and (2) CIU 16-02145 regarding alleged incidents on July 31, 2016, September 4, 2016, and September 28, 2016. (*Id.*, ¶ 16). On October 17, 2016, Sergeant Ferinde "filed an internal investigation complaint (CIU 16-02290) against Plaintiff for alleged failure to follow chain of command, minor neglect of duty, and disobeying a directive." (*Id.*, ¶ 17). Seemingly related to that internal investigation complaint, "Defendant issued Plaintiff another Notification of Internal Investigation" on October 20, 2016. Plaintiff concedes that she committed the underlying infractions but contends that Sergeant Ferinde did not discipline similarly situated coworkers

outside her protected classes for committing comparable infractions. (*Id.*, ¶ 19).

On October 23, 2016, Plaintiff filed an internal complaint alleging that Sergeant Ferinde "had subjected her to discrimination and hostile work environment based on her sex, national origin, and retaliation for reporting his actions." On November 10, 2016, Defendant suspended Plaintiff's police powers for medical reasons, identified as extreme emotional distress affecting her ability to perform her duties. On November 15, 2016, Plaintiff received therapy at Interdynamics (Defendant's contractor for psychological counseling). (ECF No. 1, ¶ 22). The therapist "diagnosed Plaintiff with extreme anxiety, confusion, inability to concentrate, daily crisis, difficulty sleeping, disturbance in appetite, [and] nightmares" and requested Plaintiff undergo a Fitness for Duty examination. (*Id.*, ¶ 23). On November 21, 2016, Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") alleging national origin and sex discrimination and retaliation (the "2016 EEOC Charge").[2] (*Id.*, ¶ 25, *see also* ECF No. 11-4).

---

[2] The 2016 EEOC Charge identified Sergeant Ferinde and Lieutenant Stanley as the discriminating officials. (ECF No. 1, ¶ 25, *see also* ECF No. 11-4). This is the only reference to Lieutenant Stanley in the complaint. The 2016 EEOC Charge did not identify any specific adverse actions, stating generally: "Beginning in or around March 2016 and continuing to present, I have been repeatedly disciplined for things that similarly-situated [o]fficers are not disciplined for, and Sergeant Ferinde

In December 2016, Plaintiff underwent hip surgery. From December 2016 to February 2017, Plaintiff was on medical leave. During this time, Plaintiff received treatment from Dr. Kenneth Tapper, with MedStar Health, and Mary Louise Gercke, a nurse at Mercy Medical Center Public Safety Infirmary ("PSI"), another of Defendant's contractors.[3] Dr. Tapper and Ms. Gercke disagreed about when Plaintiff would be able to return to work. On January 20, 2017, Dr. Tapper determined Plaintiff could not return to work until February 17, 2017. (ECF No. 1, ¶ 27). On February 10, 2017, Ms. Gercke asked Plaintiff about her physical limitations and commented that Plaintiff could return to work because she could squat. (*Id.*, ¶ 28). Plaintiff informed Ms. Gercke of Dr. Tapper's recommendation. Ms. Gercke also asked Plaintiff about the 2016 EEOC Charge, which Plaintiff had not disclosed, "caus[ing] Plaintiff to become visibly upset and cry." (*Id.*, ¶ 29).

The date of Plaintiff's return to work is unclear. After the January appointment, Dr. Tapper revised his recommended date for Plaintiff to return to work at least twice. (ECF No. 1, ¶¶ 32-33). On March 17, 2017, Dr. Tapper concluded Plaintiff could not return to work until April 1, 2017. (*Id.*). Plaintiff identifies her return to work as occurring both in February 2017, (*id.*, ¶ 30),

---

has harassed me by yelling and cursing at me." (ECF No. 11-4, at 1).

[3] Plaintiff does not explain Dr. Tapper's or MedStar Health's connection to Defendant.

4

and on May 25, 2017 (*id.*, ¶¶ 48, 51).  She must have returned to work in some capacity in February 2017, however, because "Defendant issued two disciplinary actions under Preventable Departmental Accidents" at that time.  (*Id.*, ¶ 30).  Plaintiff again concedes that she committed the underlying infractions but contends that Defendant did not discipline similarly situated coworkers outside her protected classes for committing comparable infractions.  (*Id.*, ¶ 31).

In April 2017, Internal Affairs ("IA") contacted Plaintiff to coordinate "an interview regarding the four . . . open IA cases that 'were connected to Plaintiff's EEOC complaint' against [Sergeant] Ferinde."[4]  (ECF No. 1, ¶ 34).  In May 2017, Plaintiff learned that "Defendant did not recognize 'stress medical' as 'line of duty' and would not pay for her leave[.]" (*Id.*, ¶ 41).  Plaintiff contacted Gale Dyson, an administrative secretary for the SWD, who "confirmed that Defendant would not pay for 'stress medical[]'" and advised that Plaintiff had exhausted her accrued leave hours, accrued a negative leave balance, and faced wage

---

[4] The four open IA cases appear related to the Notifications of Internal Investigation issued to Plaintiff by Defendant in September and October 2016: (1) CIU 16-01518; (2) CIU 16-02145; and (3) CIU 16-02290.  (ECF No. 1, ¶¶ 16-18).  The complaint is unclear, however, and there is a possibility that these four cases relate to Plaintiff's complaints against Sergeant Ferinde.  (*Id.*, ¶ 36 ("Plaintiff reported to IA as directed and overheard [Detective Gordon] speaking with other [d]etectives who commented that Plaintiff's cases were 'bull sh*t' and there was nothing to sustain.")).

garnishment.   (*Id.*, ¶ 42).   Defendant did not provide Plaintiff the option of utilizing its leave donation program.

On May 22, 2017, Plaintiff had a therapy session with Kimberly M. DeBerry, PhD, an Interdynamics counselor. Dr. DeBerry requested that Plaintiff be transferred from the SWD upon her return to light duty.   (ECF No. 1, ¶ 47).   Sergeant Hunter, the former administrative sergeant for the SWD, denied the transfer "stating that Plaintiff's injury was not recognized as 'line of duty' by the city and therefore Interdynamics is not considered."   (*Id.*, ¶ 48).   Plaintiff unsuccessfully sought a meeting with Sergeant Hunter to discuss the denial.   On May 25, 2017, Plaintiff returned to work and learned "that she was assigned to work the front desk for the [SWD] which caused Plaintiff to experience a severe panic attack."   (*Id.*, ¶ 52).   After the panic attack, she received an assignment to the Eastern District for the night.

Beginning June 1, 2017, "Plaintiff was assigned to the Juvenile Booking Unit with [Sergeant Abdulmalik Lundy] as her direct supervisor and [Lieutenant] Charles Carter as her second-line supervisor."[5]   (ECF No. 1, ¶ 56).   Plaintiff met with Lieutenant Carter and explained that prisoner contact exacerbated her mental health struggles.   (*Id.*, ¶ 57).   Plaintiff also met with Sergeant Lundy and "disclosed that she suffered from severe

---

[5] Plaintiff interchangeably identifies Abdulmalik Lundy as both a Lieutenant and a Sergeant.   The opinion will identify him as Sergeant Lundy.

anxiety/panic attacks[.]" (*Id.*, ¶ 58).  Plaintiff remained on light duty (due to her depression and stress) while assigned to the Juvenile Booking Unit although she had been cleared from light duty due to her hip injury on February 10, 2017.  (*Id.*, ¶ 61). Throughout June 2017, Plaintiff participated in an early intervention program.  (*Id.*, ¶¶ 62-66).  Plaintiff also details progress made by Internal Affairs regarding the open IA cases from July 2017 to October 2017.  She indicates that Detective Gordon "requested information about her EEOC complaints[]" and "explained that the complaints filed by [Sergeant] Ferinde against Plaintiff were baseless and would be closed as unsubstantiated which[,] in his opinion, strengthened Plaintiff's EEOC complaints."  (*Id.*, ¶¶ 71-72).

In February or March of 2018, all personnel in the Juvenile Booking Unit, except for Plaintiff, attended training for inmate fingerprinting certification.  Lieutenant Carter informed Plaintiff that she was excluded because she was on light duty but Plaintiff alleges that another similarly situated coworker on light duty attended the training.  On March 19, 2018, Plaintiff filed a second charge of discrimination with the EEOC alleging disability, national origin, and sex discrimination and retaliation (the "2018 EEOC Charge").  (ECF No. 1, ¶ 79; *see also* ECF No. 11-2).  The 2018 EEOC Charge did not identify any specific adverse actions.  (ECF No. 11-2, at 2-5).

On April 4, 2018, Lieutenant Carter informed Plaintiff "that she had to perform fingerprinting duties which required . . . direct contact with prisoners." (*Id.*, ¶ 80).  Plaintiff met with Sergeant Lundy and Lieutenant Carter "and explained again that she suffered from disabilities and the negative impact prisoner contact had on her." (*Id.*, ¶ 81).  She reminded them that she had no prisoner contact "for almost one year without any issues." (*Id.*, ¶ 82).  Lieutenant Carter requested medical documentation but commented "that Plaintiff 'could have the doctor write whatever [she] wanted[.]'" (*Id.*, ¶ 83).  On April 9, 2018, Lieutenant Carter "demanded that Sergeant Foster direct Plaintiff to go to PSI and obtain a discharge paper to prove that she cannot have contact with prisoners."[6]  (*Id.*, ¶ 85).  That same day, Plaintiff had a therapy session with Thomas Green, M.D., an Interdynamics counselor, and he confirmed that "contact with inmates is likely to worsen Plaintiff's symptoms and delay recovery." (*Id.*, ¶¶ 85-87).  The next day, "Plaintiff reported to PSI with Dr. Green's medical documents and met with Officer Lovitt, police liaison, and explained . . . [Lieutenant] Carter's request for medical documentation." (*Id.*, ¶ 88).  Officer Lovitt directed Plaintiff to Sergeant Ferinde for guidance.[7]   After Plaintiff met with

---

[6] Sergeant Foster's position vis-à-vis Lieutenant Carter and Plaintiff is unclear.

[7] Here, the complaint again identifies Sergeant Ferinde as Plaintiff's supervisor. (ECF No. 1, ¶ 89).  It is unclear whether

Officer Lovitt, someone - Plaintiff does not identify who -
escorted Plaintiff to meet with the Director of PSI, Dr. Aatif
Hayat. "Dr. Hayat produced an [o]rder dated the same day (April
10, 2018) signed by [Sergeant] Ferinde ordering a Fitness for Duty
test based on no contact with prisoners." (*Id.*, ¶ 93).  Plaintiff
informed Dr. Hayat that she had counsel and that she had filed an
EEOC complaint against Sergeant Ferinde.   Dr. Hayat and Officer
Lovitt spoke, and Dr. Hayat decided against performing a Fitness
for Duty test that day.

    "From April 11, 2018 to present, Plaintiff has been required
to have direct contact with prisoners."  (ECF No. 1, ¶ 100).
Lieutenant   Carter   continued   to   seek   Plaintiff's   medical
documentation regarding her contact with prisoners and directed
Plaintiff to perform fingerprinting duties.   On April 24, 2018,
Plaintiff submitted a request for reasonable accommodations.   On
May 14, 2018, Sergeant Lundy informed Plaintiff that she would be
responsible for the duties at Central Booking Intake Facility
("CBIF"), involving "continuous and frequent contact with adult
inmates." (*Id.*, ¶ 111).  On May 17, 2018, Plaintiff amended the
2018 EEOC Charge "to include the ongoing incidents." (*Id.*, ¶ 114;
*see also* ECF No. 11-3).

---

Sergeant Ferinde continued to be her supervisor, along with
Lieutenant Carter and Sergeant Lundy, when Plaintiff was assigned
to the Juvenile Booking Unit.

As the parties explain (and contest) in their papers, the remaining facts outlined in the complaint relate to a third charge of discrimination filed by Plaintiff with the EEOC on March 12, 2019 (the "2019 EEOC Charge").  On September 6, 2018, Defendant scheduled a Fitness for Duty examination for Plaintiff with Dr. Hayat on September 12, 2018.  (ECF No. 1, ¶ 115).  Dr. Hayat concluded "that Plaintiff was able to work with the limitation of no enforcement duties." (*Id.*, ¶ 116).  Dr. Hayat also directed Plaintiff to return in four weeks for a follow up appointment. (*Id.*).  Plaintiff reported to PSI for medical evaluation in October 2018, November 2018, December 2018, and January 2019.  (*Id.*, ¶ 117).  During this time, Plaintiff alleges that Lieutenant Carter "continued ongoing harassment" of her by subjecting her to less desirable assignments (in particular, assigning her to CBIF), refusing to rotate other available officers to CBIF, and removing Plaintiff from desk duties.  (ECF No. 1, ¶¶ 118-19).  Plaintiff discussed the unfair assignment with Lieutenant Carter and he "explained that he needed 'two males' in the cell block area because they are stronger so Plaintiff had to be assigned to CBIF." (*Id.*, ¶ 120).  In November 2018, Dr. Hayat's discharge instructions recommended two limitations: (1) no enforcement duties and (2) no prisoner contact.  (*Id.*, ¶ 123).  Lieutenant Carter then assigned Plaintiff to the cell block area.  (*Id.*, ¶ 124).

On November 6, 2018, the EEOC dismissed Plaintiff's 2018 EEOC Charge. (ECF No. 1, ¶ 6). On February 3, 2019, Plaintiff filed the instant complaint and asserted nine claims: (1) sex discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.* ("Count I"); (2) national origin discrimination under Title VII ("Count II"); (3) retaliation under Title VII ("Count III"); (4) discriminatory hostile work environment under Title VII ("Count IV"); (5) retaliatory hostile work environment under Title VII ("Count V"); (6) disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12101 *et seq.* ("Count VI"); (7) failure to accommodate in violation of the ADA ("Count VII"); (8) retaliation under the ADA ("Count VIII"); (9) hostile work environment under the ADA ("Count IX").[8] Counts I through V are the Title VII claims and Counts VI through IX are the ADA claims. On October 7, 2019, Defendant filed the presently pending motion to dismiss.[9] (ECF No. 11). Plaintiff responded (ECF Nos. 14; 15), and Defendant replied (ECF No. 20).

---

[8] As Defendant notes, the complaint "incorrectly contains two separate Count VIII[s]." (ECF No. 11-1, at 3 n.2). The opinion refers to the second-listed Count VIII as Count IX.

[9] Defendant seeks dismissal under both Fed.R.Civ.P. 12(b)(1) and Fed.R.Civ.P. 12(b)(6). (ECF No. 11, at 1). Presumably, Defendant thinks Plaintiff's alleged failure to exhaust administrative remedies merits dismissal under Fed.R.Civ.P. 12(b)(1). The Supreme Court of the United States recently held that failure to exhaust is not jurisdictional. *Fort Bend Cty. V. Davis*, 139 S.Ct. 1843, 1848-51 (2019).

## II.  Standard of Review

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  In evaluating the complaint, unsupported legal allegations need not be accepted. *Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989).  Legal conclusions couched as factual allegations are insufficient, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), as are conclusory factual allegations devoid of any reference to actual events. *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2).  Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## III. Analysis

It is extremely difficult to resolve the motion to dismiss because the complaint, and the parties' papers, do not clearly delineate the adverse employment actions about which Plaintiff complains, with the exception of discriminatory hostile

environment and retaliatory hostile environment.  There is simply no way to assess the claims in Counts I through III without more specification.

An adverse employment action for disparate treatment claims "is a discriminatory act which adversely affects the terms, conditions, or benefits of the plaintiff's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004).  A new job assignment that is less appealing to the employee is insufficient unless the plaintiff can show that the reassignment had some detrimental effect.  *Id.* at 376.  "[A]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position."  *Id.* (quoting *Boone v. Goldin*, 178 F.3d 253, 256-57 (4th Cir. 1999).

The "standard for establishing an adverse employment action under Title VII's antiretaliation provision is more expansive than the standard for demonstrating a tangible employment action under the statute's discrimination provisions." *Ray v. Int'l Paper Co.*, 909 F.3d 661, 670 (4th Cir. 2018).  "An adverse employment action is one that 'well might have dissuaded a reasonable worker' from engaging in protected conduct." *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  "Although an adverse

action need not affect the terms and conditions of employment, there must be some direct or indirect impact on an individual's employment as opposed to harms immaterially related to it." *Id.* (citations and quotation marks omitted).  As outlined *infra*, Plaintiff will be allowed to amend and supplement to specify, if she is able, any adverse employment actions and to link those alleged adverse employment actions to her protected actions.

Defendant contends that Plaintiff "improperly included time-barred facts to support her claims[,]" "[failed] to exhaust her administration remedies," and "failed to make out a claim for [sex] and national origin discrimination."  (ECF No. 11-1, at 2). Plaintiff largely disagrees, although she concedes that she included certain time-barred information only for background.

**A.   Timeliness and Exhaustion of Administrative Remedies**

The ADA and Title VII require a plaintiff to file an EEOC charge of discrimination within a prescribed limitations period. *See* 42 U.S.C. § 2000e-5(e)(1); 42 U.S.C. § 12117(a) (adopting the administrative exhaustion requirements of Title VII).  In deferral states, like Maryland, the limitations period is 300 days from the date of the allegedly discriminatory act.[10]  *Id.*  The ADA and Title

---

[10] A "deferral state" is one that has its own state or local agency with authority to grant or seek relief from employment discrimination or to institute criminal proceedings on behalf of the alleged victim.  42 U.S.C. § 2000e-5(e)(1).  The Maryland Commission on Civil Rights is the applicable state enforcement agency.

VII open the door for a private citizen to bring a civil action only upon either: (1) the dismissal of the administrative action by the EEOC, or (2) after 180 days have elapsed from the filing of the administrative claim with the EEOC.  42 U.S.C. § 2000e-5(f)(1).  Once the door opens, the plaintiff has 90 days to file a claim.  *Id.*

Defendant raises three arguments regarding this administrative framework; the first argument involves the 2016 EEOC Charge, the second argument involves the 2018 EEOC Charge, and the third argument involves the 2019 EEOC Charge.

### 1.   The 2016 EEOC Charge

Plaintiff filed the 2016 EEOC Charge on November 21, 2016 and the EEOC dismissed the action on December 13, 2016.  (ECF Nos. 11-4; 11-5).  Defendant argues that Plaintiff failed to file suit within 90 days of dismissal and that Plaintiff's claims are therefore untimely.  (ECF No. 11-1, at 6).  Plaintiff concedes that she included details underlying the 2016 EEOC Charge "as relevant background information only[,]" (ECF No. 14, at 4), and "disclaims any entitlement [to] relief" based on the 2016 EEOC Charge (*id.*, at 6).  Plaintiff also notes that the 2016 EEOC Charge "did not allege discrimination based on disability" and argues that "the facts alleged regarding her disabilities are not time-barred based on the date when she became disabled." (*Id.*, at 7).  Defendant's reply notes Plaintiff's concession and contends that

15

Plaintiff knew of her current disability claims because her hip injury occurred in March 2016 and her mental health struggles developed between March and November 2016. (ECF No. 20, at 2-5). Therefore, Defendant argues that Plaintiff's failure to include the disability claims in the 2016 EEOC Charge, or to amend the 2016 EEOC Charge to include them, renders them untimely now. (*Id.*, at 3-4).

Plaintiff may include the 2016 allegations as relevant background information. *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996). Defendant's argument regarding Plaintiff's knowledge of her disability claims by November 2016 is unpersuasive. Plaintiff did not undergo hip surgery until December 2016 and did not return to work until at least February 2017. Plaintiff challenges Defendant's failure to make the leave donation program available to her, failure to reassign her to another district, failure to honor her no prisoner contact limitation, and failure to honor her no enforcement duty limitation as failures to provide reasonable accommodations. (ECF No. 1, ¶¶ 44-45, 48, 57, 123). These alleged failures occurred beginning in May 2017, well after Plaintiff filed the 2016 EEOC Charge and received notice of her right to sue.

### 2. The 2018 EEOC Charge

Plaintiff filed the 2018 EEOC Charge on March 19, 2018 and amended her charge on May 17, 2018. (ECF No. 1, ¶¶ 79, 114).

Defendant acknowledges this charge is "properly at issue" but contends that, after applying the 300-day limitation period outlined above, "only those facts and/or acts that occurred on or after May 23, 2017 could properly be included in [the 2018 EEOC Charge] and thus the instant suit." (ECF No. 11-1, at 7 (emphasis omitted)). Defendant requests that paragraphs 11 through 47 of the complaint "be struck." (*Id.*, ¶ 8). Plaintiff responds that those allegations are not untimely because they are part of a continuing violation. (ECF No. 14, at 7-8). Defendant counters that Plaintiff's complaint alleges "independent and isolated incidents, which are not the kind of 'continuing action' that might excuse the untimeliness of her filing." (ECF No. 20, at 4).

The "continuing violation" theory "allows for consideration of incidents that occurred outside the time bar when those incidents are part of a single, ongoing pattern of discrimination." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002); *see also Davenport v. Maryland*, 38 F.Supp.3d 679, 686 (D.Md. 2014). The theory only applies, however, to hostile work environment claims. *Morgan*, 536 U.S. at 117; *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 209 n.5 (4th Cir. 2019) ("Unlike claims for disparate treatment and retaliation, the continuing violation doctrine applies to a hostile work environment claim. Thus, the timeliness issues discussed regarding [Plaintiff's] disparate

treatment and retaliation claims do not apply here." (citations omitted)).  Plaintiff's allegations predating May 23, 2017 may only support her hostile work environment claims; they are untimely for her remaining claims.  As noted at the outset, moreover, what precisely the adverse employment actions alleged to have been discriminatory is not stated.

### 3.  The 2019 EEOC Charge

Plaintiff filed the 2019 EEOC Charge on March 12, 2019, after she filed the instant complaint on February 3, 2019 but before the 180-day time period for the EEOC to respond expired on September 8, 2019.  (ECF No. 14, at 5).  Defendant argues that Plaintiff failed to exhaust her administrative remedies.

This issue arises out of the parties' failure to communicate effectively.  Plaintiff contends that, prior to filing the complaint, her counsel alerted Defendant to the exhaustion issue.  (ECF No. 14, ¶ 4; ECF No. 15-2, ¶ 5).  From Plaintiff's perspective, including the 2019 EEOC Charge appeared efficient.  (*Id.*).  The alternatives to including the 2019 EEOC Charge were (1) omitting the 2019 EEOC Charge in the complaint and amending the complaint upon exhaustion to include it or (2) omitting the 2019 EEOC Charge in the complaint and filing a new lawsuit upon exhaustion to advance the 2019 EEOC Charge.  (*Id.*).  Plaintiff therefore included the 2019 EEOC Charge in the complaint but stated her intention to file an amended complaint without the 2019 EEOC

18

Charge if Defendant "intended to seek dismissal for failure to exhaust[.]" (*Id.*).

Despite Plaintiff's disclosure, Defendant apparently did not inform Plaintiff of its intention to seek dismissal for failure to exhaust. Now Plaintiff offers to amend the complaint, not to remove the 2019 EEOC Charge as she offered in March, but to "cure any defect . . . regarding administrative exhaustion." (ECF No. 14, at 9). Defendant, not Plaintiff, "compound[s] [the] confusion" surrounding this issue. (ECF No. 20, at 6). Plaintiff's inclusion of the 2019 EEOC Charge supplements the complaint and does not present an exhaustion issue. She should promptly file an amended or supplemental complaint to add facts occurring after the filing of the initial complaint. Fed.R.Civ.P. 15(d) ("On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense.").

## B.   Title VII (National Origin and Sex Discrimination)

Defendant argues that Plaintiff fails to state a claim for national origin and sex discrimination because her allegations are

conclusory and because the complaint makes only passing references to her protected classes.[11]   (ECF No. 11-1, at 9-11).

Title VII prohibits discrimination "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. 2000e-2(a)(1). Plaintiff's disparate treatment and hostile work environment claims fall under § 2000e-2. *Perkins*, 936 F.3d at 206. Title VII also prohibits discrimination based on an employee's opposition to any employment practice made unlawful by Title VII or participation in any Title VII investigation, proceeding, or hearing. 42 U.S.C. § 2000e-3. Plaintiff's retaliation claim falls under § 2000e-3. *Perkins*, 936 F.3d at 206.

"To evaluate Title VII claims in the absence of convincing direct evidence of discriminatory intent, courts apply the burden-shifting analysis outlined in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973)." *Chang Lim v. Azar*, 310 F.Supp.3d 588, 600 (D.Md. 2018). Plaintiff does not provide direct evidence

---

[11] Defendant's motion seeks dismissal of Counts I through V but focuses its argument on Plaintiff's discrimination claims (Counts I and II).   Defendant fails to distinguish Plaintiff's hostile work environment and retaliation claims (Counts III through V).   To establish a *prima facie* hostile work environment claim, Plaintiff must first prove that she was harassed because of her protected status (her national origin and sex).   *Moret v. Green*, 494 F.Supp.2d 329, 341 (D.Md. 2007).   Plaintiff fails to do so here.   To establish a *prima facie* retaliation claim, however, Plaintiff need not prove discrimination.

for any of her Title VII claims and must proceed under the
*McDonnell Douglas* approach.  Under the *McDonnell Douglas* approach,
the plaintiff must first establish a *prima facie* case of
discrimination.  *Hill v. Lockheed Martin Logistics Mgmt., Inc.*,
354 F.3d 277, 285 (4th Cir. 2004).  If the plaintiff does so, the
burden then shifts to the employer to assert a "legitimate,
nondiscriminatory reason" for the allegedly discriminatory
conduct.  *Id.*  "If the employer meets that burden of production,
'the burden shifts back to the plaintiff to prove by a
preponderance of the evidence that the employer's stated reasons
were not its true reasons, but were a pretext for discrimination."
*Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 558-
59 (4th Cir. 2011) (quoting *Hill*, 354 F.3d at 285).

Counts I and II raise sex and national origin discrimination
claims based on disparate treatment.  To establish a *prima facie*
case, a plaintiff must present facts demonstrating: (1) membership
in a protected class; (2) satisfactory job performance; (3) adverse
employment action; and (4) different treatment from similarly
situated employees outside the protected class.  *Perkins*, 936 F.3d
at 207.  Although Plaintiff need not "allege facts sufficient to
establish a *prima facie* case under Title VII on a motion to
dismiss, [s]he must nevertheless plead facts sufficient to support
a reasonable inference that an alleged adverse employment action
was motivated by bias or discrimination."  *Chang Lim*, 310 F.Supp.3d

at 601.  Plaintiff has not done so here.  Plaintiff identifies herself as Italian female and identifies her supervisors, Sergeant Ferinde, Sergeant Lundy, and Lieutenant Carter, as American males. (ECF No. 14, at 10-12).  She also emphasizes Lieutenant Carter's statement "that he needed 'two males' in the cell block area because they are stronger[.]" (*Id.*, at 12).  These conclusory allegations are insufficient.  Moreover, until/unless Plaintiff identifies conduct sufficient to constitute specific adverse employment actions, such as ultimate disciplinary actions, her suggestion that others were treated less harshly does not begin to contain enough detail.  Counts I and II will be dismissed.

Count III raises a retaliation claim.  "To establish a *prima facie* case of retaliation, a plaintiff must present facts that establish that (1) the plaintiff engaged in a protected activity; the employer took an adverse employment action against the plaintiff; and (3) 'there was a causal link between the two events.'"  *Chang Lim*, 310 F.Supp.3d at 603 (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015)). Plaintiff summarily concludes that "Defendant subjected [her] to unlawful retaliation" but does not identify the adverse employment action she challenges or connect it to any protected activity that she took.  (ECF No. 1, ¶ 142).  Count III will be dismissed.

Counts IV and V raise discriminatory and retaliatory hostile work environment claims.  A hostile work environment exists "when

the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions the of the victim's employment and create an abusive working environment." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (alteration omitted)).  "To prove such a claim, a plaintiff must show that (1) the plaintiff experienced unwelcome harassment; (2) the harassment was based on the plaintiff's race, color, religion, national origin, or [sex]; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." *Chang Lim*, 310 F.Supp.3d at 599.  Plaintiff's conclusory allegations of national origin and sex discrimination and harassment are again insufficient.  She alleges legal conclusions, not facts.  Counts IV and V will be dismissed.

Defendant's motion does not seek dismissal of Plaintiff's ADA claims under Fed.R.Civ.P. 12(b)(6).  Counts VI through IX will proceed.

### C.  Motion for Leave to File an Amended Complaint

Plaintiff's response "requests an opportunity to move for leave to file an amended complaint[.]" (ECF No. 14, at 12). Defendant opposes this request.  (ECF No. 25, at 9).  Plaintiff notes that she "intends to seek Defendant's consent and/or file a

motion for leave to file an [a]mended [c]omplaint [to describe further her] claims and supplement the facts alleged regarding: (1) similarly-situated employees outside of Plaintiff's classes treated more favorably; and (2) Plaintiff's exhaustion of administrative remedies[.]" (*Id.*, at 2).  The former reason is insufficient by itself.  Unless a disciplinary action constitutes an adverse action by itself, or is part of a sufficient hostile environment or retaliation claim, the identification of others purportedly treated more favorably would not matter.  Amending or supplementing to add facts occurring since the initial complaint, such as satisfying exhaustion requirements, would be appropriate. Plaintiff is advised to be thorough and specific in preparing an amended and supplemental complaint, delineating, if she can, specific adverse employment actions so that proper evaluation of the sufficiency of the claims can be conducted.

## IV.  Conclusion

For the foregoing reasons, the motion to dismiss filed by Defendant BCPD will be denied in part and granted in part.  A separate order will follow.

/s/
DEBORAH K. CHASANOW
United States District Judge