IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|                                         |   |                               |
|-----------------------------------------|---|-------------------------------|
| EVA TONIN                               | : |                               |
|                                         | : |                               |
| v.                                      | : | Civil Action No. DKC 19-0323  |
|                                         | : |                               |
| BALTIMORE CITY POLICE DEPARTMENT        | : |                               |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination suit are a motion to dismiss for failure to state a claim, (ECF No. 24), and a motion for leave to file opposition to Defendant's motion to dismiss out of time. (ECF No. 27). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Plaintiff's motion for leave to file her response will be granted, and Defendant's motion to dismiss will be granted in part and denied in part.

**I.  Background**

Unless otherwise noted, the facts outlined here are set forth in the amended complaint and construed in the light most favorable to Plaintiff. Plaintiff Eva Tonin ("Ms. Tonin") is a resident of Washington, D.C., and, until recently, was employed by Defendant the Baltimore City Police Department ("BPD"). Ms. Tonin was hired on August 29, 2010, as a Police Officer. She alleges that her

performance was "always satisfactory," and she was eventually assigned to Defendant's Southwest District in 2013.  It is there that her supervisor John Ferinde, she claims, first "subjected her to discriminatory harassment based on her sex, national origin, and retaliation after she reported and complained about him."

The mistreatment came to a head after Plaintiff returned to work on March 2016 following a "work-related car accident" that left her with limited ability to "walk, stand, and bend."  At some point thereafter, Sgt. Ferinde's alleged "constant discrimination and harassment" caused Plaintiff to suffer from "extreme stress, anxiety and depression."  A series of incidents followed where Plaintiff was increasingly denied the reasonable accommodations she felt she needed for her latter mental conditions, particularly no direct contact with prisoners.  She also was subjected to a series of reprimands and transfers that she felt were retaliatory in nature due to her EEOC complaints in 2016, 2018 and 2019, as well as her continued requests, in some instances, to secure accommodations she had previously been offered.

This background is well laid out in the previous opinion partially dismissing the original complaint and granting Plaintiff leave to amend.  (ECF No. 21); *Tonin v. Balt. City Police Dept.*, No. DKC 19-0323, 2020 WL 3259083, at *1-11 (D.Md. June 15, 2020).  The general allegations in the amended complaint are mostly

2

unchanged from those in the original complaint. (*Compare* ECF No.1, *with* ECF No. 23).[1]

The original complaint, filed on February 3, 2019, brought five claims against the BPD under Title VII, 42 U.S.C. §§ 2000e *et seq* ("Title IV") for discrimination based on sex and national origin, retaliation, hostile work environment and retaliatory hostile work environment (Counts I-V), and four claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq* ("the ADA").   On October 7, 2019, the BPD filed a motion to dismiss for failure to state a claim.   It first argued that the 2016 EEOC complaint by Plaintiff was not properly before the court and that only the conduct occurring within 300 days of the 2018 EEOC complaint filed on March 19, 2018, were not time-barred.   It also challenged Counts I-V for their failure factually to support Plaintiff's discrimination claims under Fed.R.Civ.P. 12(b)(6). (ECF No. 11).

The earlier ruling held that the events underlying Plaintiff's 2016 EEOC complaint could be included as background only (except possibly as they related to a claim of hostile work environment), that only those claims occurring after May 23, 2017, were not time-barred, and that an amended complaint that added facts after the initial filing of the 2019 EEOC claim would be

---

[1] The analysis below highlights where added facts are relevant to one of the five Counts contained in the amended complaint.

properly considered.   Counts I-V were dismissed with leave to amend, but Plaintiff's claims under the ADA, Counts VI-IX, survived as unchallenged on Fed.R.Civ.P. 12(b)(6) grounds.  *Tonin*, 2020 WL 3259083 at *6-*9.

Plaintiff filed an amended complaint on July 7, 2020.  (ECF No. 23).  Defendant moved to dismiss the amended complaint on July 28, 2020.  (ECF No. 24).  On August 10, the day before Plaintiff's opposition was due, the parties filed a consent motion requesting an extension of time to file their respective opposition and reply, (ECF No. 25), which the court denied by paperless order.  (ECF No. 26).  Despite this denial, Plaintiff did not respond immediately to the motion to dismiss.  Instead, more than seven weeks later, on October 2, 2020, she filed a motion for leave to file a response to defendant's motion to dismiss that included a proposed opposition.  (ECF No. 27).  Despite its earlier consent to the extension request, Defendant responded in opposition to Plaintiff's motion to file a response out of time.  (ECF No. 28).

**II.  Motion for Leave to File Opposition**

In defending her filing more than seven weeks after the opposition deadline and the denial of the parties' consent motion for an extension, Plaintiff's counsel points to numerous causes of delay.  Some of these predate the previous ruling on the consent motion, such as a "family matter" and her child's birthday party she attended to on the week of August 3, 2020, as well as deadlines

4

in "administrative matters," and a case conference scheduled on August 6, 2020.  Counsel explains how various crises occurred at work right around the time of the deadline for an opposition and afterwards.  The day before the consent motion was filed, for instance, a "Senior Counsel" in her firm went on leave because her spouse tested positive for Covid-19, requiring her colleague's family to quarantine.  Her colleague's absence left no one to help her "perform work or supervise Associate Attorneys."  She also states that she was required to cover for some of the matters with which this colleague was involved.  Plaintiff's counsel points to an August 12 email to Defendant's counsel detailing her various work and personal responsibilities and asking for his consent to the extension, to which he agreed.  (ECF No. 27-4).  The next day, however, a "cybercrime incident" occurred involving a client's money, and Plaintiff's counsel was tasked with working on notices to clients and government officials.  Because of a security breach involved with the incident, Plaintiff's firm's "IT provider" caused Plaintiff's counsel further delays by limiting her and other colleagues' access to her computer and platforms.

The delays detailed throughout the end of August and September, on the other hand, do not revolve around discrete emergencies but report several hearing and filing deadlines for other clients and challenges for her at home amid the realities of the COVID pandemic.  Plaintiff's counsel also reports that starting

on September 3, 2020, she was tasked with onboarding a new Associate Attorney.  All of this, she argues, presents "good cause" and "excusable neglect" that merits granting her an extension under Fed.R.Civ.P.6(b)(1)(A) and (B).  Pointing to the standard for pre-trial schedule modifications, Plaintiff adds these events also satisfy the definition of "good cause" pursuant to Fed.R.Civ.P. 16(b)(4).

The BPD comments that "Defendant's counsel is sympathetic to these struggles.  They are representative of the kind of struggles that all attorneys face from time to time."  This, the BPD continues, is why it "consented to Plaintiff's request for additional time to file an Opposition, even though Plaintiff has had years to plead her case properly."  It argues that, at this juncture, however, "these commonplace struggles do not excuse ignoring a Court Order and failing to inform the Court of the status of the Opposition until seven weeks after it was due."[2]  For this reason, the BPD says it did not consent to the October 1 request to file out of time and asks the court not to consider the late response.

Regardless of the merits of the initial request to extend the filing deadline, counsel cannot simply ignore the fact that the

---

[2] The Defendant correctly points out that even if the court had granted the consent motion to extend, Plaintiff's submission would still have been a few days late.  (ECF No. 28, ¶ 12).

request was denied and do nothing for nearly two months.   Other cases in which leave was granted have generally involved much less delay.  *See, e.g.*, *Afzal v. Aslam*, No. WMN-11-395, 2011 WL 2457682 at *1 n.1 (D.Md. June 15, 2011) (granting a plaintiff's motion for leave to file opposition citing a *four-day* delay in filing due to CM/ECF "Accessibility Problems").   Moreover, other cases have rejected a delay of this length when a technical issue occurring firm-wide is cited.  *See, e.g.*, *Johnson v. Nat'l R.R. Passenger Corp.*, No. 07-1806, 2008 WL 11396762 at *2 (D.D.C. April 1, 2008) ("[T]he court rejects Plaintiff's argument that an internal problem with email notifications causing him to miss the defendant's motion to dismiss [until nearly a month after the deadline] constitutes 'excusable neglect' pursuant to [Fed.R.Civ.P.] 6(b).").

Nevertheless, as Judge Bennett has stressed, the standard under Fed.R.Civ.P. 6(b) is a "discretionary" and "equitable one, and hinges on the characteristics of the delay and the movant's culpability."  *Lee v. Safeway, Inc.*, No. RDB-13-3476, 2014 WL 4926183 at *3 (D.Md. Sep. 30, 2014) (citing *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 895 (1990) and *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)).   The confluence of outside events affecting Plaintiff's counsel and her firm constitutes good cause for an extension under Fed.R.Civ.P. 6(b).   The prejudice to Defendant from the delay would be *de*

minimis (the merits of its motion will be reached either way), and there is no reason to doubt the particular challenges faced by Plaintiff's counsel in light of the "cybercrime incident" at her firm and other COVID related challenges as they impacted her professional and personal life.  The motion for leave to file Plaintiff's opposition will be granted, and the proposed opposition will be considered.

## II.  Motion to Dismiss

### A.   Standard of Review

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  A plaintiff's complaint need only satisfy the standard of Fed.R.Civ.P. 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).  At this stage, all well-pleaded allegations in a complaint must be considered as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and all factual allegations must be construed in the light most favorable to the plaintiff, see *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)).  "Rule 8(a) (2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n. 3 (2007).

In evaluating the complaint, unsupported legal allegations need not be accepted. *Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989). Legal conclusions couched as factual allegations are insufficient, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), as are conclusory factual allegations devoid of any reference to actual events. *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)). Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

**B.   Title VII Retaliation**

The BPD argues that Ms. Tonin's amended complaint fails for many of the same reasons Counts I-V were dismissed in the original complaint. The Title VII retaliation claim in Count I, it argues, is a "repackaging of Count III" in the previous complaint that fails to state any "adverse employment action" taken by Defendant against Plaintiff in connection with "any protected activity that she took."

Plaintiff alleges that she "filed EEOC Complaints [that] complained about discrimination and retaliation." These constituted "protected activities" and allegedly prompted Defendant, learning of these complaints, to "subject[] her to unfounded complaints, investigations, and discipline." (ECF No. 23, ¶¶ 163-64).  This Count, as with the others, incorporates the generalized allegations preceding it.  Many of these allegations recount conduct predating May 23, 2017, and thus, as explained, are untimely as to Plaintiff's retaliation claims, except that those events may serve as "relevant background information." *Tonin,* 2020 WL 3259083, at *6 (explaining that Maryland, as a deferral state, has a 300-day limitations period running back from the 2018 EEOC complaint thus time barring all related allegations, except for hostile work environment, occurring before this date).[3]

The entire complaint, unfortunately, is not drafted in an understandable format.  Instead of linking any actions to any of the causes of action, Plaintiff merely outlines the entire course of conduct and then labels it retaliation.  While Defendant asserts that none of the actions were sufficiently "adverse" to constitute retaliation, it primarily argues that Plaintiff has not alleged

---

[3] Her 2016 EEOC Complaint is relevant as a protected activity of which her employer undoubtedly was aware by May 24, 2017. *See Karpel v. Inova Health System Servs.*, 134 F3d 1222, 1229 (4th Cir. 1998) ("She clearly engaged in protected activity when she filed her EEOC complaint.").

facts showing any causal link between her protected activity and any adverse action.

The amended complaint seeks to tie, among other things, transfers to what Plaintiff contends are less desirable posts, a general non-responsiveness and failure to honor her multiple "reasonable accommodation" requests to avoid all prisoner contact, and an "Intervention" meeting held seemingly to put Ms. Tonin on notice of poor performance, as retaliatory conduct by the BPD that links back to her 2016 EEOC Complaint.  At the same time, however, she also seeks to tie this same conduct to the requests for accommodation themselves.  For example, she details how on May 24, 2017, she called two of her supervisors, Sgt. Hunter, the "Administrative Sgt. For Southwest District," and a Lt. Saunders requesting reassignment as per her therapist's recommendation. Instead, she was told her injury in a work-related car accident in 2016 was not found to be in the "line of duty" and her request was denied.  Sgt. Hunter subsequently agreed to meet with her to discuss the decision but did not show up at the planned meeting. Shortly, thereafter, Lt. Saunders informed her that she had been "assigned to work the front desk for the Southwest District."  Ms. Tonin implies that this constituted a form of retaliation for all her past requests and complaints as she reports having a "severe panic attack" in getting word of her assignment; a Lt. Colburn

ultimately "[re-]assigned her to the Eastern District for that night." (ECF No. 23, ¶¶ 56-60).

Defendant claims that none of these allegations address the central complaint in the previous opinion as to the deficiencies of what was labeled "Count III" in the original complaint:

> Count III raises a retaliation claim. "To establish a *prima facie* case of retaliation, a plaintiff must present facts that establish that (1) the plaintiff engaged in a protected activity; [(2)] the employer took an adverse employment action against the plaintiff; and (3) 'there was a causal link between the two events.' " *Chang Lim*, 310 F.Supp.3d at 603 (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015)). Plaintiff summarily concludes that "Defendant subjected [her] to unlawful retaliation" but does not identify the adverse employment action she challenges or connect it to any protected activity that she took. (ECF No. 1, ¶ 142).

*Tonin*, 2020 WL 3259083 at *8. Defendant stresses that Plaintiff again fails to show causation between protected activity and its conduct and to show "materially adverse employment actions." (ECF No. 24-1, at 8). Even if the conduct in the amended complaint describes conduct that is "materially adverse" under the relatively lower standard for retaliation (compared to what is adverse in the discrimination context), Plaintiff fails to establish a plausible causal link between such episodes and either her 2016 or 2018 EEOC complaints. Ms. Tonin points to a multitude of actions taken by apparent supervisors with no clear explanation

of that individual's position relative to Plaintiff or Defendant. Her 2016 EEOC, upon which the bulk of the "retaliation" is apparently aimed, alleges discrimination on the basis of national origin and sex and states that this is what motivated Sgt. Ferinde's "discipline and harassment in violation of Title VII" against her. (ECF No. 11-4, at 1). Yet, as Defendant point out, with these underlying discrimination claims now dismissed, she has shifted to claiming Defendant's conduct, acting through various supervisors, was a continuation of Sgt. Ferinde's alleged harassment and was retaliation against this complaint itself.

Defendant is right to object this "kitchen sink" approach. (ECF 24-1, at 10). Treating a similar set of claims in a Fed.R.Civ.P. 12(b)(6) motion, Judge Hollander has explained that, "[t]o allege the requisite causation under Title VII, the plaintiff must plead that the retaliation 'would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Brown v. Bratton*, No.: ELH-19-1450, 2020 WL 886142, at *20 (quoting *Univ. of Tex. Sw. Med. Ctr. V. Nassar*, 570 U.S. 338 360 (2013)) ("Defendants have moved to dismiss all fifteen counts of the Complaint, which they aptly characterize as a 'kitchen sink' pleading."). To accomplish this, "there must exist 'some degree of *temporal proximity* to suggest a causal connection.'" *Id*. (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005)). There the

plaintiff complained of termination, the quintessential adverse action, and yet the court commented "[a] period of almost two years between the protected conduct and the termination is far too remote to raise an inference of causation between the filing of the EEOC Charge and the termination." *Id.* (quoting *Hooven-Lewis v. Caldera*, 249 F.3d 259, 278 (4th Cir. 2001)).   This court has also stressed that, "[w]here temporal proximity is the only evidence of causation . . . 'the temporal proximity must be very close." *Sewell v. Strayer Univ.*, 956 F.Supp.2d 658 (D.Md. 2013) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

Here, Plaintiff argues that a course of conduct by Sgt. Ferinde beginning shortly after her hiring was not only discriminatory but, now that the Title IX allegations of discrimination have been dismissed, also retaliatory.   Plaintiff implies that this conduct, continued by Plaintiff's other supervisors and occurring over seven years, can all be imputed to retaliatory motives.   In fact, she now alleges it culminated with her termination.

The amended complaint fails to make a plausible causal connection between her 2016 and 2018 EEOC complaints and any of the generally alleged conduct.   This course of conduct, moreover, is simply too attenuated in time from her original EEOC complaint plausibly to argue that it was its motivating factor, particularly when Plaintiff formerly alleged it was also motivated by her

national origin, sex, disability and request for disability
accommodations.  Moreover, her termination need not be considered,
both because Plaintiff tells the court not to, but also because
she fails to establish a connection to it and any of Plaintiff's
claims.  Ultimately, there are no plausible allegations of a
concerted plan to punish Ms. Tonin for her complaints by the BPD.
As uncomfortable as these encounters with Sgt. Ferinde and others
may have been, nothing in the amended complaint connects the
alleged conduct, in any kind of particularized way, to her
complaints to the EEOC.  Count I will be dismissed.

C.    The ADA Claims

The BPD argues that the other counts in the amended complaint,
all related to her disability, also fail because BPD's failure
fully to accommodate Ms. Tonin for her "anxiety and mental
condition" "*ad infinitum*" does not constitute discrimination.  It
asserts that a failure to accommodate a person exactly how she
wants forever does not constitute discrimination or a failure to
accommodate under 42 U.S.C. §§ 12101 *et seq.* for Counts II and
III, respectively.  As to the ADA retaliation and hostile work
environment claims (Counts IV and V), it argues that Plaintiff has
failed to "point to any adverse employment actions against her."

Except for the factual enhancements to numerous portions of
the general allegations, the remaining allegations specific to
Counts II-V are verbatim the same (except changed headers and minor

15

typographical corrections) as Counts VI-IX found to survive as unopposed under Fed.R.Civ.P. 12(b) in the previous opinion and prior to granting Plaintiff leave to amend the others. *Tonin*, 2020 WL 3259083 at *9. Nonetheless, Defendant challenges these claims now, although little of the underlying and relevant conduct has changed between the original and amended complaint.

### 1.   Retaliation

Count IV (as with Count VIII in the original complaint) alleges that that Defendant "subjected Plaintiff to unlawful retaliation based on her protected activity of requesting reasonable accommodations for her disability." (ECF No. 23, ¶ 175-178).   Unlike with the Title VII retaliation, Defendant only attacks the ADA Hostile Work Environment claim, and not the ADA Retaliation claim, on causation grounds.   Instead, it doubles down on its argument that it has subjected Plaintiff to no materially adverse actions that would constitute retaliation.   In doing so, however, Defendant distorts the relevant standard.   It contends that reassignment alone cannot constitute an adverse action but cites to a case where the *sole* claim of both discrimination and retaliation was a *single* reassignment.   (ECF No. 24-1, at 12) (citing *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999)).   That case itself centrally relied on *Page v. Bolger*, 645 F.2d 227 (4th Cir. 1981), to which Defendant also cites, but *Page* involved only discrimination claims and *no retaliation allegations at all*. (*Id.*)

16

(citing *Page*, 645 F.2d at 233) (explaining how the test for adverse action under a *discrimination* claim focuses on "ultimate employment decisions.").

Defendant has conflated the standard for an adverse action for a discrimination claim with the relevant standard for retaliation.  The Fourth Circuit has explained that Title VII retaliation standards apply equally to ADA retaliation claims. *S.B. ex rel. A.L. v. Bd. Of Educ. Of Harford Cty.*, 819 F.3d 69, 78 (4th Cir. 2016) (citing *Rhoads v. F.D.I.C.*, 257 F.3d 373, 391 (4th Cir. 2001); *see* 29 U.S.C § 12203.  A "materially adverse," action in the *retaliation* context is one that "well might" be enough "to dissuade[] a reasonable worker from making or supporting a charge of discrimination." *S.B. ex rel*, 819 F.3d at 78 (citing *Burlington N. & Santa Fe R&R Co.*, 548 U.S. 53, 54, 68 (2006)).

Plaintiff alleges that the same conduct aimed at her by the BPD for reporting claims to the EEOC under Title VII was equally aimed at her for repeatedly requesting "reasonable accommodations" to avoid contact with prisoners due to her depression and anxiety. (*See, e.g.*, ECF No. 23, ¶¶ 56-61).  For example, the amended complaint, as with the original, highlights how, on April 24, 2018, Plaintiff submitted a "request for reasonable accommodations pursuant to Department Policy 1737."  Nevertheless, upon emailing the address provided by this policy, her email bounced back, and her phone calls rang unanswered and with no option to leave a

17

voicemail.   Shortly thereafter, on May 13, 2018, Plaintiff was told by a Lt. Lundy that she would be assigned to Central Booking Intake Facility ("CBIF").   In her amended complaint, Plaintiff adds new details on how dangerous and triggering to someone with her condition CBIF can be with poor supervision of prisoners and with a high likelihood of encountering prisoners in passing.   She also contends it is "less desirable" as a post with poor lighting and dreary conditions, and that some "similarly-situated" colleagues with the "same restrictions" as she were allowed to avoid it.   (ECF No. 23, ¶¶ 130-141).

A reasonable worker in Plaintiff's shoes well might have been dissuaded by this kind of transfer, and the other demands made of Ms. Tonin,[4] from continuing to pursue reasonable accommodations for her condition.   This is particularly true given that almost all the instances of alleged retaliation occurred close in time to one of Plaintiff's accommodation requests.   Defendant quotes from *Williams v. Va. Polytechnic Inst. & State Univ.*, 451 F.Supp.3d 467, 479 (E.D.Va. 2020), for the relevant standard for a retaliation claim, but this case was decided on summary judgment, and not on a motion to dismiss.   Moreover, the ADA retaliation

---

[4] For example, Plaintiff also adds new details around how interviews and supplemental information was demanded of her for internal investigations that were held open for years, even after one initiated by Sgt. Ferinde was found to be "unfounded."   (ECF No. 23, ¶¶ 81-82, 87, 115).

claims survived there because, "[t]he short time period between her last accommodation request and the adverse action give rise to a causal inference." *Id.* at 479.[5]   The motion to dismiss as it relates to Count IV will be denied.

### 2.   Discrimination and Failure to Accommodate

Ms. Tonin alleges under Count II that the BPD "subjected [her] to unlawful discrimination based on her disability in violation of the ADA," and in Count III that it similarly "subjected [her] to unlawful discrimination based on her disability by its failure to engage in an interactive dialogue with [her] regarding reasonable accommodations   and   its   failure   to   provide   reasonable accommodations . . . in violation of the ADA."   (ECF No. 23, ¶¶ 167-172).

It is unclear what separate discrimination, if any, Plaintiff is asserting, outside of the failure to accommodate.   As Judge Hollander has written:

> To plead a claim for failure to accommodate, an employee must allege facts that show: (1) she was an individual with a disability within the meaning of the ADA; (2) the employer had notice of her disability; (3) with reasonable accommodation, she could perform the essential functions of the position; and (4) the employer refused to make such accommodations.

---

[5] Such a lack of temporal attenuation on this claim may be why Defendant does not challenge causation here.

*Chappel v. Balt. Cty. Pub. Schs.*, No. ELH-18-3328, 2019 WL 1746697 at *5 (D.Md. April 17, 2019) (quoting *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4ᵗʰ Cir. 2001)).  The fact that there is no reference to discriminatory intent in this rule is not an accident.  Under the Act "a plaintiff need not show that the employer . . . acted with a discriminatory motive.  The denial of a 'reasonable accommodation' alone is discrimination." *EEOC v. Mfrs. & Traders Tr. Co.*, 429 F.Supp.3d 89, 106 (D.Md. 2019) (citing *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F.Supp. 720, 742 (D.Md. 1996)).  Defendant's motion does not clarify things except to attack *both* Counts on the same grounds: that the ADA only requires *reasonable* accommodation not the accommodation preferred by an employee forever.  With only the bald assertion that Plaintiff was subject to "unlawful discrimination" because she had anxiety and depression, but without factual support to determine a separate cause of action beyond a failure to accommodate, these two counts will be treated as one and the same.[6]

---

[6] Plaintiff's opposition fails to distinguish Count II from Count III, even with elaboration.  She reiterates only that the ADA prohibits "'employment discrimination' against a qualified individual on the basis of disability in regard [sic]. . . advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." (ECF No. 27-6, at 8) (citing *Scott v. Lori*, No. ELH-19-2014 U.S. Dist. LEXIS 119750, at *3 (D.Md. July 8, 2020)).  She goes on to detail that the Amended Complaint alleges that she suffers both from physical disabilities ("hip impairment limited her ability to walk, stand, and bend"), and mental disabilities

Defendant argues, as a threshold matter, that Plaintiff's claim is "confusing" because, on the one hand, she admits that she was, in fact, properly accommodated for a period, but on the other hand, complains that she was not accommodated properly otherwise. Unfortunately for Defendant, offering a reasonable accommodation at one period does not insulate an employer from a challenge at another time.  In fact, Plaintiff openly remarks that she was properly accommodated in the period prior to her transfer to CBIF and able to do her job fully.  Her allegation in Count III makes specific reference to Defendant's alleged "revoking reasonable accommodation" that comes "and/or" with its failure affirmatively to provide such accommodations.  Her opposition highlights that, as per the amended complaint and starting on April 4, 2018, "Lt. Carter revoked her reasonable accommodations and directed her to perform fingerprinting duties which required direct contact with prisoners and despite her repeated requests for reasonable accommodations, since April 11, 2018, Plaintiff has not been accommodated."

---

("extreme stress, anxiety, and depression that caused confusion, inability to concentrate, difficulty sleeping, and disturbance in appetite"); that Defendant knew about the conditions; and that she was, nonetheless, "at all times capable of performing all essential functions of her job position with reasonable accommodations." Thus, she effectively only argues that she was "otherwise qualified" under the failure to accommodate standard.

Nonetheless, Defendant's central argument is that the amended complaint is defective as "Plaintiff believes that she is entitled to serve in perpetuity as a police officer without having to do anything remotely close to police work.  More fundamentally . . . Plaintiff believes she is entitled to whatever accommodation she wants, for the duration of her employment." (ECF No. 24-1, at 11) (citing *Fleetwood v. Harford Sys. Inc.*, 380 F.Supp. 2d 688, 700 (D.Md. 2005) (rejecting Plaintiff's request for "permanent help from a colleague" as an unreasonable accommodation in requiring "permanent help with an *essential duty*.") (emphasis added)). Really, Defendant's argument boils down to alleging that the accommodation requested by Plaintiff is unreasonable, and it therefore does not have to honor it.  Plaintiff counters in her opposition that her contact with prisoners was found by an expert, as stated in her amended complaint, to "worsen [Plaintiff's symptoms and delay recovery." (ECF No. 27-6, at 11) (citing ECF No. 23, ¶¶ 101-02).  This implies that these accommodations need not be permanent as she works towards recovery.

Regardless of the indeterminant end date for such accommodations, Defendant, argues "Plaintiff is not entitled to an accommodation of her choosing." (ECF No. 24-1, at 9).  Even if true, Defendant fails affirmatively to argue that the accommodations it provided were reasonable, even if Ms. Tonin's requests were not.

More importantly, Defendant's argument is premature as it goes to the merits of what form of accommodation is reasonable in light of Ms. Tonin's diagnosis.  Such analysis is inappropriate at this stage.  To this point, the case cited by Defendant was decided on a motion for summary judgment.  *See Fleetwood*, 380 F.Supp.2d at 696.  Seen in the light most favorable to Plaintiff, her request for no prisoner contact is reasonable, particularly as it was honored for almost a year.  (*See* ECF No. 23, ¶ 68).  Defendant stopped honoring that request.  Plaintiff plausibly states she could have performed the essential functions of her job had the BPD instead properly attended to her condition in some fashion.  While Count II will be dismissed as duplicitous, Ms. Tonin has plausibly stated a claim for a failure to accommodate.  Defendant's motion to dismiss Count II will be granted, but its motion to dismiss Count III will be denied.

**D.   Hostile Work Environment**

As correctly implied in Defendant's motion to dismiss, much of the same conduct that informs Plaintiff's retaliation claim, informs her hostile work environment claim.  As noted in the previous opinion, however, the "continuing violation" theory allows consideration of events occurring before May 23, 2017 as they relate to the hostile work environment claim.  *Tonin*, 2020 WL 3259083 at *6 (citing *Holland v. Wash Home, Inc.,* 487 F.3d 208, 219 (4th Cir. 2007) (finding the theory applies to hostile work

environment claims, but not disparate treatment or retaliation claims, and "allows consideration of incidents that occurred outside the time bar when those incidents are part of a single, ongoing pattern of discrimination")).

Therefore, additional facts from the amended complaint can be considered, including the claim, discussed thoroughly in the previous opinion and unchanged in the amended complaint, that on September 28, 2016 Defendant issued Plaintiff "two (2) separate Notifications of Internal Investigation" involving undisclosed "incidents" on June 24, 2016 and September 6, 2016, despite her involvement in a March 2016 work-related car accident in which she "suffered injuries to her hip." (*See* ECF No. 23, ¶¶ 12-26); *Tonin*, 2020 WL 3259083 at *1. As also previously detailed, Sgt. Ferinde filed a separate internal investigation complaint against Plaintiff "for alleged failure to follow chain of command, minor neglect of duty, and disobeying a directive," for which she received another notice thereafter. (*Id.*, ¶¶ 17-19).

It was for these instances, and others, that Plaintiff filed her 2016 EEOC complaint against Sgt. Ferinde on October 23, 2016. In alleged response, Sgt. Jason Bennett (whose exact relation to Defendant, as with others, remains unclear) submitted a memorandum to Maj. Robert Jackson (same) that Plaintiff's "police powers had been suspended that day due to medical reasons" including "extreme emotional distress that is affecting her ability to perform the

24

duties as a Police Officer." Shortly thereafter, she began her treatment with Michele Coakley at Interdymanics who first diagnosed her with the mental issues she continues to report. (*Id.*, ¶¶ 22-24).

Another otherwise time-barred series of incidents revolving around her recovery from surgery on her hip is also relevant to the hostile work environment claim. Plaintiff adds new details to her return to work from medical leave on February 10, 2017. Nurse Mary Louise Grecke met with Plaintiff, as Defendant's medical provider, "to assess the status of her disability." Ms. Tonin claims she "interrogated her" about her physical limitations and made dismissive and sarcastic remarks towards them ("you can squat? . . . you can return to work now"). The nurse, she claims, also made "accusations" that continued and "were not limited to Plaintiff's medical condition and disability." Nurse Gercke even questioned Plaintiff about her EEOC complaint "which [Plaintiff] had not disclosed [to her]." These comments, Ms. Tonin argues, were "based on [her] disability and her need for accommodations . . . and [were] stated to intimidate Plaintiff and deter her from engaging in protected activity and to return to work earlier than her physician had requested." (ECF No. 23, ¶¶ 27-32).

This period was also apparently marred by Mr. Herron's issuance of two disciplinary actions against her that found that she had "allegedly committed Preventable Departmental Accidents,"

which she now adds were dated December 19, 2016.[7]  Similarly, on
April 25, 2017, as detailed in the original complaint, a Detective
Edward Gordon with IA reached out to Plaintiff to interview her
regarding "four (4) open IA cases" that "were connected to
Plaintiff's EEOC complaint" against Sgt. Ferinde.  (ECF No. 23,
¶ 39).  Det. Gordon expressed a wish to "close out" the open cases,
and Plaintiff subsequently overheard him on April 26, 2017 speaking
with other Detectives and commenting that the cases against her
were "bull sh*t."  She claims these comments "confirmed" to her
that these complaints and internal investigations were all part of
"ongoing harassment, ridicule, and discipline."  (ECF No. 23, ¶
46).  All of this led to Plaintiff's discovery on May 18, 2017,
discussed above, whereby she realized her wages were being
garnished.

   A hostile work environment sets a high bar.  The Fourth
Circuit has explained that, in proving a hostile work environment
under the ADA, a modified version of the Title VII test is used in
which:

> an ADA plaintiff must prove the following to
> establish  a hostile work environment claim:
> (1) he is a qualified individual with a
> disability; (2) he was subjected to unwelcome

---

[7] A Lt. Balboa had apparently told Plaintiff not to expect
any disciplinary actions "after the incidents" even though she
claims, "Defendant had knowledge of Plaintiff's disability,
requests for reasonable accommodations, and issued these
disciplinary actions for incidents that occurred over 6-months
earlier" anyway.  (ECF No. 23, ¶ 34).

> harassment; (3) the harassment was based on
> his disability; (4) the harassment was
> sufficiently severe or pervasive to alter a
> term, condition, or privilege of employment;
> and (5) some factual basis exists to impute
> liability for the harassment to the
> employer. *See Brown v. Perry,* 184 F.3d 388,
> 393 (4th Cir. 1999)

*Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001) (citing *Brown v. Perry*, 184 F.3d 388, 393 (4th Cir. 1999)). Judge Grimm has clarified that a plaintiff must allege "not only that [s]he subjectively perceived h[er] workplace environment as hostile, but also that a reasonable person would so perceive it, i.e., that it was objectively hostile." *Wilson v. Montgomery Cty. Brd. Of Trs.*, No.: PWG-17-2784, 2018 WL 43000498, at *5 (D.Md. Sept. 10, 2018) (citing *Fox*, 247 F.3d. at 178). This objective test looks to "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Walton v. Mental Health Ass'n*, 168 F.3d 661, 667 (3d Cir. 1999)).

Defendant stresses that Plaintiff has failed to demonstrate a "hostile or deeply repugnant" workplace, as the claim requires, as opposed to a "merely unpleasant" one. (ECF No. 24-1, at 14) (citing *Edmonson v. Potter*, 118 F.App'x 726, 730 (4th Cir. 2004)). *Fox* itself, the BPD highlights, found "actionable harassment" where a plaintiff's supervisors referred to the plaintiff and other

"disabled workers" as "handicapped MF" and "hospital people." 274 F. 3d at 179. Defendant also claims that Plaintiff fails to show the conduct took place "*because* of her disability."

On both the issue of severity and causal connection to her disability, Plaintiff's opposition adds little except the conclusory remark that she suffered "recurring unwelcome conduct based on her disability and requests for reasonable accommodations from February 2017[,] when she returned to work from medical leave[,] until January 25, 2019[,] that were sufficiently severe to alter her terms of employment." (ECF No. 27-6, at 14) (quoting *Boyer-Liberto* 786 F.3d at 277). The remainder of the filing reiterates that Plaintiff was "harassed and questioned about her disability's physical limitations" and issued two reprimand letters regarding six-month old conduct when she first returned from medical leave in February 2017, just as she was "harassed and subjected to investigative interviews" based "on complaints that had no merit" with her other return from medical leave in April 2017.

The question of causal connection need not be addressed on this claim,[8] as Ms. Tonin's allegations, even viewed collectively over the entire relevant period, fail plausibly to state the kind

---

[8] The only place causation is potentially relevant is with Plaintiff's unexplained reference to her termination. As discussed before, however, the termination need not be considered as to any of these claims without more information.

of severe, perverse and outwardly discriminatory conduct that constitutes a hostile work environment under the ADA. The hostile conduct need not necessarily consist of the kind of aggressive, degrading and outwardly hostile comments towards Plaintiff and other disabled people seen in *Fox*. The reprimands, questioning, selective ignoring, and transferring of Plaintiff to undesirable posts, which serve the basis of her retaliation claim, however, are simply not concentrated enough in time or severity to give rise to a proper hostile work environment claim. None of this conduct is sufficiently disruptive to alter the terms of employment for an objectively reasonable person, even if it was found to be subjectively hostile by Plaintiff because of her extreme stress, anxiety and depression. Count V will be dismissed.

## III. Conclusion

For the foregoing reasons, the motion for leave to file an opposition by Plaintiff is granted and the motion to dismiss filed by Defendants will be granted in part and denied in part. A separate order will follow.

               /s/

         DEBORAH K. CHASANOW
         United States District Judge
